

Opinions of the United
States Court of Appeals
for the Third Circuit

7-18-1997

# Barton & Pittinos v. SmithKline Beecham

Precedential or Non-Precedential:

Docket 96-1941

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Barton & Pittinos v. SmithKline Beecham" (1997). *1997 Decisions*. Paper 161.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/161

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 18, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-1941

BARTON & PITTINOS, INC.
Appellant

v.

SMITHKLINE BEECHAM CORPORATION

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. Civ. No. 95-CV-6619)

Argued: June 13, 1997

Before: COWEN, ALITO, and GARTH, Circuit Judges

(Opinion Filed: July 18, 1997)

BARBARA W. MATHER (Argued)
PHILIP H. LEBOWITZ
NICOLE D. GALLI
PEPPER, HAMILTON & SCHEETZ
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103

KENNETH H. ZUCKER
PEPPER, HAMILTON & SCHEETZ
1235 Westlakes Drive, Suite 400
Berwyn, PA 19312

 Attorneys for Appellant

JAMES D. COLEMAN (Argued)
THOMAS B. ROBERTS
BALLARD SPAHR ANDREWS &
 INGERSOLL
1735 Market Street, 51st Floor
Philadelphia, PA 19103

 Attorneys for Appellee

**OPINION OF THE COURT**

ALITO, Circuit Judge:

Appellant Barton & Pittinos, Inc. ("B&P") is a pharmaceutical marketing company. B&P entered into a contract with appellee SmithKline Beecham Corp. ("SKB") to market SKB's Engerix-B vaccine for hepatitis-B ("the vaccine") to nursing homes. Under the terms of the program, B&P would provide the nursing homes with information about the vaccine and would solicit orders. B&P would then pass the orders to General Injectables and Vaccines, Inc. ("GIV"), which would buy the vaccine from SKB and then resell it to the nursing homes, with B&P receiving a commission. When SKB, B&P, and GIV launched this program, SKB, it is alleged, was inundated with a flood of complaints from the consultant pharmacists who had traditionally supplied the nursing homes with SKB's vaccines and other pharmaceutical products. Assertedly bowing to pressure from the pharmacists, SKB terminated the program.

B&P brought this action against SKB, alleging that SKB conspired with the pharmacists to restrain competition in the nursing home market for the vaccine, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. B&P also asserted claims under state law for breach of contract and unjust enrichment. The district court granted summary judgment in favor of SKB on B&P's antitrust claim on the ground that B&P lacked standing to sue for its alleged injuries under the antitrust laws. B&P appealed. We hold that the injury alleged by B&P is not the type of injury that the antitrust laws were intended to prevent because B&P was not a

2

competitor or a consumer in the market in which trade was allegedly restrained. Since B&P therefore cannot demonstrate "antitrust injury," it lacks standing under the antitrust laws. Accordingly, we affirm.

I.

In 1991, B&P learned that the Occupational Safety and Health Administration would soon require employers whose employees might be exposed to blood-borne pathogens to educate their employees about the vaccine against hepatitis-B and to make the vaccine available to them free of charge. See 29 C.F.R. § 1910.1030 (1991). At the time, the only manufacturers of the vaccine were SKB and Merck & Co. Sensing an opportunity to profit from this regulatory mandate, B&P developed a plan to market the vaccine to nursing homes. SKB agreed to pay B&P a flat fee in exchange for B&P's preparation and distribution to the nursing homes of educational materials regarding the vaccine and the regulations. B&P performed the agreed-upon work and SKB compensated it according to the contract. The next step in the program was for B&P to telephone the nursing homes (under the trade name "The Medical Phone Company") to solicit orders for the vaccine. B&P contends that SKB agreed to pay it a commission of 7% on sales of the vaccine as compensation for these telemarketing services.[1]

Because B&P, as a marketing company rather than a pharmaceutical company, lacked the required license to buy, possess, or sell the vaccine, the program did not call for B&P actually to distribute the vaccine to the nursing homes. Rather, B&P's function was to drum up demand for the vaccine, solicit orders from the nursing homes, and pass the orders along to GIV, a licensed medical supply house. GIV would fill the orders by purchasing the vaccine from SKB and would then resell the vaccine to the nursing homes.

The program debuted in January 1992. Before the
_____

1. In accordance with the law governing summary judgment, in our recitation of the facts we accept B&P's evidence as true.

commencement of this program, the nursing homes had traditionally obtained their vaccines and other pharmaceutical products from "consultant pharmacists." A nursing home's consultant pharmacist would educate nursing home administrators and staff about pharmaceutical products and regulatory requirements; assist the nursing home in storing its pharmaceuticals and in keeping the required records relating to their prescription; negotiate directly with pharmaceutical manufacturers regarding price and other terms of purchase of pharmaceutical products; and take orders from the nursing home, purchase the desired products from the manufacturers, and resell them to the nursing home. Because the SKB/B&P/GIV program promised economically advantageous terms to the nursing homes, the nursing homes accorded the program a favorable reception.

The nursing homes' gain, however, was the pharmacists' loss. Almost immediately, many individual pharmacists as well as pharmacist trade associations complained to SKB that the program bypassed and undercut them on price, and some threatened to boycott SKB products if SKB continued the program.[2] In March 1992, following meetings with pharmacist groups, SKB discontinued the program. SKB terminated the telemarketing and distribution program involving B&P and GIV and reverted to its prior practice of distributing the vaccine through consultant pharmacists. Even after SKB ended the program, it continued to explore the possibility of continuing to employ B&P to help to market the vaccine, but the parties were unable to reach agreement.

II.

B&P filed this action in October 1995. Under § 4 of the Clayton Act, 15 U.S.C. § 15, B&P claimed that it was entitled to treble damages for SKB's conspiracy with the pharmacists to restrain trade in the market for sales of the vaccine to nursing homes, in violation of § 1 of the

─────────────────────────────

2. Some state regulatory bodies, apparently at the instigation of pharmacist groups, also expressed concern to SKB and GIV about the program, but it does not appear that any official action was taken.

Sherman Act, 15 U.S.C. § 1. B&P also pled claims under state law, alleging that SKB had breached its contract with B&P by terminating the telemarketing program and refusing to pay B&P any commission and, in the alternative, that SKB had been unjustly enriched by the receipt of B&P's telemarketing services.

In August 1996, SKB moved for summary judgment, contending that B&P lacked antitrust standing because it was neither a competitor nor a consumer in the market in which trade was allegedly restrained. The district court held that B&P had failed to show that its alleged injury constituted "antitrust injury" and granted the motion. Barton & Pittinos, Inc. v. SmithKline Beecham Corp., 942 F. Supp. 235, 237 (E.D. Pa. 1996). The court also held that the existence of more direct victims than B&P and the danger of complex apportionment of damages among those injured by the alleged conspiracy weighed againstfinding that B&P had antitrust standing. Id. at 237-38. With B&P's lone federal claim dismissed, the court declined to exercise supplemental jurisdiction over the state law claims and dismissed them without prejudice. Id. at 238.

In this appeal, B&P argues that the district court erred in finding as a matter of law that it did not compete with the pharmacists. B&P submits that the record contains evidence from SKB, Merck, and the pharmacists themselves showing that they all believed that B&P competed with the pharmacists. We exercise plenary review over the district court's grant of summary judgment. McCarthy v. Recordex Services, Inc., 80 F.3d 842, 847 (3d Cir.), cert. denied, 117 S.Ct. 86 (1996).[3]

---

3. In our review, we "apply the same test the district court should have used initially." In re Unisys Sav. Plan Litig., 74 F.3d 420, 433 n.10 (3d Cir.), cert. denied, 117 S.Ct. 56 (1996). Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). On a summary judgment motion the court must construe the evidence in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences. See In re Unisys, 74 F.3d at 433 n.10.

III.

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" may maintain a private action for treble damages. Despite this broad statutory language, however, the Supreme Court has held that the common-law background of the antitrust laws requires a narrower, less literal reading. See Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 529-33 (1983) ("AGC"). In developing the concept of antitrust standing, the Court "focus[ed] on the nature of the plaintiff's alleged injury," asking "whether it is of the type that the antitrust statute was intended to forestall." Id. at 538-39. If the injury is not of the requisite type, even though the would-be plaintiff may have suffered an injury as a result of conduct that violated the antitrust laws, he or she has no standing to bring a private action under the antitrust laws to recover for it. In AGC, the Court held that because the plaintiff was "neither a consumer nor a competitor in the market in which trade was restrained," its injury was not the type of injury that the antitrust laws were designed to prevent. Id. at 539. Therefore, the plaintiff might be able to sue under a different statute or common-law rule, and a different plaintiff might be able to sue under the antitrust laws, but the plaintiff had no standing to sue under the antitrust laws. See also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977).

The Supreme Court in AGC also discussed other factors that must be balanced in order to determine whether a plaintiff is a proper party to bring an antitrust claim. See 459 U.S. at 540-44. We have synthesized the Court's analysis into the following formulation of the factors that are relevant in an antitrust standing challenge:

(1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal

6

application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1165-66 (3d Cir. 1993) ("Lake Erie").

The district court in this case relied principally on the second factor that we identified in Lake Erie. On the basis of its conclusion that B&P was not a competitor or a consumer in the market allegedly restrained, the court held that B&P's injury was not of a type that the antitrust laws were designed to prevent. See Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co., 113 F.3d 405, 415 (3d Cir. 1997) ("A plaintiff who is neither a competitor nor a consumer in the relevant market does not suffer antitrust injury") (quoting Vinci v. Waste Management, Inc., 80 F.3d 1372, 1376 (9th Cir. 1996)).

Antitrust injury is a necessary but insufficient condition of antitrust standing. Lake Erie, 998 F.2d at 1166 ("antitrust injury is more than a component to be factored in a standing analysis, it must be present in every case") (citation omitted). Even a plaintiff who can show antitrust injury may lack antitrust standing, because the remaining AGC factors may weigh against allowing him or her to sue under the antitrust laws. Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 110 n.5 (1986) ("A showing of antitrust injury is necessary, but not always sufficient, to establish standing under § 4, because a party may have suffered antitrust injury but may not be a proper party under § 4 for other reasons").4

A. We thus turn to the question whether B&P adduced sufficient evidence to permit a reasonable factfinder to

_____

4. The antitrust injury requirement in the context of antitrust standing can thus be seen as analogous to the constitutional minimum required for standing to sue in federal court in general, and the other AGC factors may be thought of as prudential limits on standing that are particularly necessary or appropriate in the antitrust context. Cf. Florida Seed Co., Inc. v. Monsanto Co., 105 F.3d 1372, 1374 (11th Cir. 1997).

conclude that it competed in the market in which trade was allegedly restrained, such that its alleged injury would constitute "antitrust injury."[5] The answer to this question depends on how that market is defined. B&P's complaint defined the relevant market as "all hepatitis-B vaccine sold to nursing homes" in the United States. (App. 25) (emphasis added). It alleged that the unlawful conspiracy aimed "to eliminate B&P as a competitor in the distribution of hepatitis B vaccine to nursing homes . . . ." (App. 25) (emphasis added). Because it is undisputed that B&P never "sold" or "distributed" or sought to sell or distribute any vaccine to anyone, however, it is plain that B&P was not a competitor in the market for sales of the vaccine.

In its briefs and at oral argument, B&P espoused a slightly different view of the relevant market and its role therein. B&P argues that the evidence demonstrates that "Barton & Pittinos and its program competed with and displaced the pharmacists." Appellant's Br. at 15. In our view, the key words in this quoted statement are "and its program." B&P is surely correct in its assertion that the program whereby B&P marketed the vaccine and GIV filled the orders solicited by B&P competed with the pharmacists. The SKB/GIV/B&P program, taken as a whole, offered a package of marketing and distribution of the vaccine -- a package that was equivalent to the package offered by the consultant pharmacists. We agree with B&P that the pharmacists' efforts to kill the SKB/GIV/B&P program show that they viewed it as competition. And we agree with B&P that the nursing homes' eagerness to abandon the pharmacists in favor of the SKB/GIV/B&P program shows that the package of goods and services offered by the SKB/GIV/B&P program was reasonably interchangeable with the package of goods and services offered by the pharmacists. See, e.g., Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.").

But the question presented in this appeal is whether B&P

_____

5. B&P does not contend that it was a consumer in the relevant market.

8

was in competition with the pharmacists, not whether "the program" was. In order to hold that B&P was in competition with the pharmacists, we would have to conclude that what B&P offered was reasonably interchangeable with what the pharmacists offered. We agree with the district court that the record cannot support such a determination. B&P's role in the program was limited to marketing the vaccine; without GIV, there was no vaccine, only information about it. Thus, the nursing homes (the consumers in the relevant market here) were able to abandon the pharmacists in favor of the SKB/GIV/B&P program, but they could not have abandoned the pharmacists in favor of B&P alone. Doing so would have left the pharmacists without the most important part of the package of goods and services offered by SKB, GIV, and B&P together: the vaccine itself. Consequently, there was no cross-elasticity of demand as between the pharmacists' offerings and B&P's offerings; no matter how much the pharmacists raised the price of the package of the goods and services that they offered, the nursing homes could not have switched to B&P.6

B. Perhaps anticipating the above analysis, B&P contends that "the fact that Barton & Pittinos worked with GIV to provide some elements of the competing package does not mean that Barton & Pittinos was not a competitor of the consultant pharmacists." Appellant's Br. at 23 (emphasis added). We accept the basic premise of B&P's argument, which is that market definition is not determined by formal labels, but rather takes into account "the realities of competition." Weiss v. York Hosp., 745 F.2d 786, 826 (3d Cir. 1984). And we acknowledge that in defining markets some courts "have recognized that a product should not be excluded from a market because it requires an additional input in order to be a reasonable substitute for other products in the market." Bhan v. NME Hosp., Inc., 772 F.2d 1467, 1471 (9th Cir. 1985) (emphasis added). But we reject

_____

6. B&P attempts to mask this defect in its argument by referring to the program as the "Barton & Pittinos program" rather than the SKB/GIV/B&P program. It thus asserts that "Barton & Pittinos offered a better package at a lower price than the consultant pharmacists." Appellant's Br. at 22. As explained in the text, this assertion is simply untrue.

9

B&P's argument, because "the realities of competition" in this case are that the nursing homes could not have switched from the pharmacists to B&P alone and because we do not believe that the product itself can fairly be described as merely "an additional input."

The cases upon which B&P relies are readily distinguishable. In Telex Corp. v. Int'l Business Mach. Corp., 510 F.2d 894, 914-19 (10th Cir.), cert. dismissed, 423 U.S. 802 (1975), the court held that Telex's and IBM's computer products were in the same market even though they were incompatible, because the "interchange of these products" was "easy and practicable." Similarly, in Bhan, the court held that nurse anesthetists and M.D. anesthesiologists competed in the same market even though nurse anesthetists required the "input" of "the supervision of an attending physician," because "such supervision is not only easily obtainable but is actually a common practice in the medical profession." 772 F.2d at 1471. In contrast, in this case it is clear that the "additional input" required by B&P -- if the vaccine itself can be so characterized -- was not "easily obtainable" or "practicable." Indeed, B&P was legally barred from buying, possessing, or selling the vaccine because it lacked the required prescription-drug license. Cf. Schuylkill, 113 F.3d at 415-16 (plaintiff could not show antitrust injury where it was prohibited by law from competing in the relevant market).

B&P relies most heavily on Yellow Pages Cost Consultants, Inc. v. GTE Directories Corp., 951 F.2d 1158 (9th Cir. 1991). In that case, GTE, the defendant, published telephone directories and sold advertisements in them. Advertisers had a choice between purchasing advertisements and advertising consulting services as a package offered at one price by GTE or purchasing advertising consulting services from the plaintiffs, independent companies that placed ads with GTE. When GTE ended its practice of allowing independent companies to place ads, the plaintiffs remained free to sell advertising consulting services, but their business suffered because advertisers found it inconvenient to deal with the plaintiffs once they could no longer place the ads as well. The Ninth Circuit held that the plaintiffs had standing because they

10

competed with GTE in the market for yellow-pages advertising consulting services. Id. at 1161-62.

Yellow Pages might help B&P if the court had held that the plaintiffs competed with GTE in the market for sales of yellow-pages advertising despite the fact that the plaintiffs did not actually sell yellow-pages ads, but rather merely information about yellow-pages ads. If such were the case, the analogy to the instant case would be good: B&P, like the Yellow Pages plaintiffs, offered marketing and educational services concerning a product, but did not offer the actual product itself. But this is not what the Yellow Pages court held. The Ninth Circuit has reiterated in subsequent cases that its holding in Yellow Pages was that "the plaintiffs and defendants did compete in the same market: the market for advising yellow page advertisers as to the form, content, and cost of yellow page advertising." Amarel v. Connell, 102 F.3d 1494, 1510 (9th Cir. 1997). Accord American Ad Management, Inc. v. GTE Corp., 92 F.3d 781, 786 n.7 (9th Cir. 1996). Yellow Pages thus does not provide a basis for holding that by marketing the vaccine B&P competed in the market for the package of marketing and distribution of the vaccine.7

B&P has not pointed us to, and we have been unable to locate, any case holding that an advertiser or broker has standing to sue for antitrust violations restraining trade in the market for sales of the good or service advertised or brokered. On the contrary, courts have held that advertisers and brokers of a good or service are not competitors of companies that actually supply the good or service. See, e.g., Bodie-Rickett and Assoc. v. Mars, Inc., 957 F.2d 287, 290-91 (6th Cir. 1992); S.D. Collectibles, Inc. v. Plough, Inc., 952 F.2d 211, 213 (8th Cir. 1992).8

_____

7. B&P does not contend that a distinct market exists exclusively for the marketing of the vaccine.

8. The district court, in reaching the same conclusion as we have, relied on evidence such as the deposition of B&P's president James Pittinos, in which Pittinos described B&P as an advertising and marketing agency which did not compete with wholesalers and pharmacists. See 942 F. Supp. at 237.

We therefore conclude that B&P did not compete with the pharmacists in the market for the package of marketing and distribution of the vaccine. Because B&P was thus not a competitor or a consumer in the market in which trade was allegedly restrained by the antitrust violations pled by B&P, we hold that B&P's alleged injury is not "antitrust injury," meaning injury "of the type that the antitrust statute was intended to forestall." AGC, 459 U.S. at 539. Accordingly, we agree with the district court's determination that B&P lacked standing to institute this private treble-damages action.9

IV.

For the foregoing reasons, we affirm the judgment of the district court.

A True Copy:
Teste:


Clerk of the United States Court of Appeals
for the Third Circuit


_____

9. Because B&P fails the antitrust injury requirement, it would lack standing even if the other AGC/Lake Erie factors favored it. We therefore need not address the district court's findings that there were more direct victims of the alleged conspiracy than B&P and that B&P's claims presented a danger of complex apportionment of damages. See 942 F. Supp. at 238. In light of our affirmance of the grant of summary judgment to SKB on B&P's antitrust claim, we affirm as well the district court's decision not to exercise supplemental jurisdiction over B&P's state law claims. B&P may properly pursue its contractual claims against SKB in state court.

12