Joseph MARTORANO, III, d/b/a
Enerco, Plaintiff

v.

PP & L ENERGY PLUS, L.L.C., and
PP & L, Inc., Defendants

No. 03–CV–5963.

United States District Court,
E.D. Pennsylvania.

Sept. 8, 2004.

Frank N. Dimeo, Jr., Rosen, Schafer, Dimeo, Philadelphia, PA, for Plaintiff.

Steven A. Reed, John G. Harkins, Jr., Harkins Cunningham, Philadelphia, PA,

James R. Atwood, David L. Meyer, Covington & Burling, Washington, DC, for Defendants.

### *MEMORANDUM AND ORDER*

ANITA B. BRODY, District Judge.

On October 28, 2003, plaintiff Joseph Martorano, III, d/b/a Enerco ("Enerco") brought this antitrust action against defendants PP & L Energy Plus, L.L.C. and PP & L, Inc. (collectively referred to as "PPL").[1] Enerco alleged that defendants' actions in the electricity market violated §§ 1 and 2 of the Sherman Antitrust Act. Jurisdiction is based on the existence of a federal question. Defendants have moved to dismiss the complaint. On August 30, 2004, the parties presented oral argument. For the reasons set forth below, defendants' motion is granted.

## I. FACTS[2]

### A. *The Electricity Market*[3]

The electricity market in Pennsylvania and New Jersey is under the control and regulation of PJM Interconnection ("PJM"), a regional transmission organization that was created by the Federal Energy Regulatory Commission. (Compl.¶¶ 9–10.) In the electricity market, those retail entities that provide energy to end-users of electricity (the general public) are known as "load serving entities" (LSEs). PJM rules require that all LSEs meet an "installed capacity" obligation, whereby each LSE must have enough electrical capacity to cover its daily energy transac-

tions. (Compl.¶ 12.) An LSE can meet its installed capacity obligation by either generating its own electricity (self-supply) or purchasing installed capacity rights ("ICAP") from wholesale capacity suppliers who are members of PJM. (Compl.¶¶ 14–15.) If an LSE is deficient in its ICAP obligation, it must pay a penalty in the form of a capacity deficiency charge, which is then disbursed among PJM capacity suppliers. (Compl.¶ 13.) An LSE can purchase ICAP by entering into bilateral agreements with capacity wholesalers or by purchasing capacity in a PJM sponsored auction market.

### B. *The Parties*

Plaintiff Joseph Martorano is the sole proprietor and operator of Enerco, a New Jersey business which provides consulting and energy procurement services to various clients in New Jersey and Pennsylvania. (Compl.¶ 4.) Enerco is paid to procure an electricity provider, an LSE, whose prices and services best fit the needs of its clients. (Compl. ¶ 20; Pl. Resp. at 1.) In other words, Enerco serves as a broker between LSEs and end-users.

Defendant PPL Corp. is an electric company based in Allentown, PA that provides electricity directly to retail customers. It also provides consulting and brokerage services to some customers. (Pl. Resp at 4–5.) Through its wholly owned subsidiary, defendant EnergyPlus, PPL Corp. also participates in the sale of wholesale electric capacity in markets that include

---

1. While the complaint refers to defendants as "PP & L Energy Plus, L.L.C." and "PP & L, Inc.," defendants indicate that the current names for the companies are "PPL Energy-Plus" and "PPL Corp." (Mem. Supp. Def. Mot. Dismiss [hereinafter Def. Mem.] 1–2.)

2. A court may only dismiss a complaint "if it appears that the plaintiffs [can] prove no set of facts that would entitle them to relief." *Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996).

The facts presented in this opinion are taken from the complaint and were confirmed by plaintiff in oral argument held on August 30, 2004.

3. A detailed description of the electricity market is available in an opinion in a prior antitrust case against defendants PPL. *See Utilimax.com, Inc. v. PPL Energy Plus, LLC. et al.,* 273 F.Supp.2d 573 (E.D.Pa.2003), *aff'd,* 378 F.3d 303 (3d Cir.2004).

Pennsylvania and New Jersey. (Compl. ¶¶ 5–6; Pl. Resp. at 4–5.)

### C. Enerco's allegations

Enerco alleges that PPL violated sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C.A. §§ 1–2, by withholding excess capacity from the PJM daily auction market, thereby driving up daily ICAP market prices. (Compl.¶¶ 23–24, 26–27.) From January 1, 2001 to April 1, 2001, PPL was the only entity that possessed uncommitted capacity resources and, in order to cover their capacity obligations, LSEs were forced to buy capacity from PPL at highly inflated prices. (Compl.¶ 25.)

Enerco's contracts with its clients depended on its ability to obtain competitive pricing for its clients from various LSEs. The price that LSEs could charge to end-users of electricity, such as Enerco's clients, was dependent on ICAP auction prices. (Compl.¶ 22.) Enerco alleges that as a result of PPL's manipulation of the ICAP price, Enerco was unable to obtain satisfactory LSEs for its clients, thereby causing several of Enerco's clients to choose not to renew their contracts with Enerco. (Compl.¶¶ 28–31.)

### III. Standard of Review

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir.1993). In ruling on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must "accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom." *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir.1996). Since the court must determine whether "under any reasonable reading of the pleadings, the plaintiff may be entitled to relief," a claim may be dismissed only "if it appears that the plaintiffs [can] prove no set of facts that would entitle them to relief." *Id.*

### IV. Discussion

Defendants move to dismiss, arguing: 1) Enerco lacks antitrust standing; 2) Enerco failed to allege the essential elements of the asserted antitrust violations; and 3) Enerco's claims are barred by the filed rate doctrine. Because I find that plaintiff lacks standing, I will not reach defendants' other arguments.

Plaintiff Enerco brings this case pursuant to § 4 of the Clayton Act, which provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" may maintain a private action for treble damages. 15 U.S.C.A. § 15. Despite this broad statutory language, the Supreme Court and the Third Circuit have narrowed the class of plaintiffs who can claim antitrust standing. *See Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (*"AGC"*); *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178 (3d Cir.1997).

█ In *AGC*, the Court held that the antitrust statutes are to be construed in light of their common-law background.[4]

---

**4.** Frequent references to common-law principles in the legislative history of the Sherman Act imply that Congress "assumed that antitrust damages litigation would be subject to constraints comparable to well-accepted common-law rules applied in comparable litigation." *AGC*, 459 U.S. at 533, 103 S.Ct. 897.

For example, the judge-made doctrines of foreseeability and proximate cause, directness of injury, certainty of damages, and privity of contract all circumscribe the availability of damages in both tort and contract litigation. *Id.* at 533–32, 103 S.Ct. 897.

*AGC,* 459 U.S. at 529–33, 103 S.Ct. 897. The Third Circuit synthesized the Supreme Court's analysis in *AGC* into the following formulation of relevant factors in deciding whether a plaintiff has antitrust standing challenge:

(1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addressed the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*Barton & Pittinos,* 118 F.3d at 181 (citing *In re Lower Lake Erie Iron Ore Antitrust Litig.,* 998 F.2d 1144, 1165–66 (3d Cir. 1993) (*"Lower Lake"*)).

While all five factors should be considered in determining the existence of antitrust standing, the second factor, whether the plaintiff's alleged injury is the type for which the antitrust laws were intended to provide redress, is a necessary condition of antitrust standing. *Barton & Pittinos,* 118 F.3d at 182; *see also Lower Lake,* 998 F.2d at 1166 ("antitrust injury is more than a component to be factored in a standing analysis, it must be present in every case"); *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 110 n. 5, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986) ("a showing of antitrust injury is necessary, but not always sufficient, to establish standing"). Therefore, I will first address the issue of whether Enerco has suffered an antitrust injury.

*A. Antitrust Injury*

■ In order to suffer an antitrust injury, a plaintiff must be either a competitor or a consumer in the market in which the antitrust violations occurred. *See AGC,* 459 U.S. at 538–540, 103 S.Ct. 897; *Barton & Pittinos,* 118 F.3d at 181. In *AGC,* plaintiff was a labor union suing an association of general contractors for pressuring landowners and other contractors to use only nonunionized subcontractors. *AGC,* 459 U.S. at 521–523, 103 S.Ct. 897. The Supreme Court held that the union's injury, that of the possible loss of jobs due to the use of nonunion labor, was not the type of injury meant to be addressed by antitrust laws because "the Union was neither a consumer nor a competitor in the market in which trade was restrained." *AGC,* 459 U.S. at 539, 103 S.Ct. 897.

■ In *Barton & Pittinos,* plaintiff was a pharmaceutical marketing company that contracted with SmithKline Beecham to market a vaccine to nursing homes. *Barton & Pittinos,* 118 F.3d at 179. Plaintiff would provide information about the vaccine to the nursing homes and solicit orders. Plaintiff then passed the orders on to a particular pharmacy and received a commission for all orders placed. Plaintiff sued when SmithKline Beecham terminated its contract due to pressure from other pharmacists who traditionally served the nursing homes. *Id.* The court held that plaintiff was not in competition with the pharmacists in the distribution of the vaccine because it was merely an advertiser or broker. Plaintiff did not have the license necessary to actually sell the vaccine. Because plaintiff "was thus not a competitor or a consumer in the market in which trade was allegedly restrained by the antitrust violations," the court held that plaintiff's "alleged injury is not [an] antitrust injury, meaning injury of the type that the antitrust statutes was intend-

ed to forestall." *Id.* at 184 (internal quotations and citations omitted). *See also Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 415 (3d Cir.1997) ("The requirement that the alleged injury be related to anti-competitive behavior requires, as a corollary, that the injured party be a participant in the same market as the alleged malefactors.... A plaintiff who is neither a competitor nor a consumer in the relevant market does not suffer antitrust injury") (internal quotations and citations omitted).

Enerco's complaint does not allege that it is either a competitor or a consumer of PPL,[5] nor, in its account of its activities, does Enerco describe a competitor or consumer of PPL. PPL's alleged antitrust violations concerned its behavior as a seller of capacity credits to LSEs. In this function, PPL was acting as a wholesaler of electricity. PPL's competitors would be other generators or wholesalers of electricity—those who were also selling excess capacity credits. PPL's consumers would be the LSEs who were purchasing capacity credits so that they could ultimately provide energy to end-users. Enerco was neither another wholesaler of electricity nor an LSE.

Enerco does not contend that it is a consumer of PPL. Rather, Enerco argues that it is a competitor of PPL in the same way that the plaintiff in *Carpet Group International v. Oriental Rug Importers Association*, 227 F.3d 62 (3d Cir.2000), was found to be a competitor of defendant. (Pl. Resp. at 10–11.) In *Carpet Group International*, plaintiff was a business that arranged buying trips and trade shows between domestic retailers of oriental rugs and foreign manufacturers. Plaintiff in that case sued an association of domestic oriental rug wholesalers and importers for bringing pressure on retailers and manufacturers to boycott plaintiff's buying trips and trade shows. The court held that plaintiff was indeed a competitor of the importers and wholesale merchants of oriental rugs because plaintiff's activity was meant to completely replace the wholesale step in the oriental carpet market. 227 F.3d at 77. Plaintiff and defendants were competitors in the same market because "there is a cross-elasticity of demand between the plaintiff['s] offering and the defendants' offering." *Carpet Group International*, 227 F.3d at 77 (footnote omitted). *See also Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 482, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (the relevant market for antitrust purposes is defined with reference to reasonable interchangeability); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir.1997) ("the outer boundaries of a relevant market are determined by reasonable interchangeability of use" which can be indicated by "cross-elasticity of demand between the product itself and substitutes for it") (internal citations omitted).[6]

Enerco argues that it is a competitor of PPL because, as the broker in *Carpet Group International* provided an alternative avenue of distribution for carpets, so did Enerco provide an alternative avenue of distribution of electricity. (Pl. Resp. at 11). In one of its functions, PPL provides

---

**5.** Even though Enerco did not allege that it was a competitor or consumer of PPL in its complaint, Enerco later argues that it is PPL's competitor in its response to the motion to dismiss and in oral argument. Therefore, I will address this argument.

**6.** "Cross-elasticity of demand is a measure of the substitutability of products from the point of view of buyers. More technically, it measures the responsiveness of the demand for one product to changes in the price of a different product." *Queen City Pizza*, 124 F.3d at 438 n. 6 (quoting E. Thomas Sullivan & Jeffrey L. Harrison, *Understanding Antitrust and its Economic Implications* 217 (1994)).

electricity directly to end-users of electricity and also provides some end-users with consulting and brokerage services. (Pl. Resp. at 4–5) Enerco argues that it was a competitor of PPL because, as a consultant who brokered agreements between end-users and independent, non-PPL affiliated LSEs, it aided the end-user in finding an alternative provider of energy. However, regardless of whether Enerco is construed as a competitor of PPL in the marketing/brokerage market or even in the LSE/retail market, the controlling question is whether Enerco is a competitor "in the market in which trade was restrained." *AGC,* 459 U.S. at 539, 103 S.Ct. 897. *See also Barton & Pittinos,* 118 F.3d at 182 (whether one is a competitor in a market in which trade was allegedly restrained "depends on how that market is defined"); *Schuylkill,* 113 F.3d at 415 (analyzing the "scope of the relevant market").

Enerco argues that there is only one electricity market from generator to user and that it is PPL's competitor in the overall electricity market. (Pl. Resp. at 21). However, PPL's alleged violations solely concern its behavior as a wholesaler of capacity on the PJM daily auction market. Enerco's services do not include the sale of capacity. Enerco's role as a consultant and broker for the end-user of electricity cannot substitute for PPL's role as a seller of capacity to LSEs. The electricity market is not one large market in which there is a cross-elasticity of demand between capacity and consulting/brokerage services. Rather, the electricity market consists of a series of markets that are up- and down-stream from each other. *See, e.g., Utilimax.com, Inc. v. PPL Energy Plus, LLC,* 378 F.3d 303, 305 (3d Cir.2004) (describing "the wholesale and retail electrical energy markets"), *aff'g,* 273 F.Supp.2d 573 (E.D.Pa.2003); *Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co.,* 113 F.3d 405, 410 (3d Cir.1997) (characterizing the electricity market as being divided into retail and wholesale markets).

Enerco's consulting and brokerage activities do not compete with PPL's wholesale of excess capacity credits to LSEs. Indeed, Enerco is merely a peripheral rather than an integral player in the wholesale electricity market. Because Enerco is "neither a consumer nor competitor in the market in which trade was restrained," I find that it has not suffered injury "of the type that the antitrust statute was intended to forestall." *AGC,* 459 U.S. at 539–540, 103 S.Ct. 897. Antitrust injury is a necessary condition of antitrust standing and plaintiff's complaint is dismissed. *Barton & Pittinos,* 118 F.3d at 182; *Lower Lake,* 998 F.2d at 1166; *Cargill,* 479 U.S. 104, 110 n. 5, 107 S.Ct. 484. Although I find that plaintiff has not suffered antitrust injury and therefore has no standing, I will examine some of the other antitrust standing factors laid out in *Barton & Pittinos,* 118 F.3d at 181, as alternative bases for the conclusion that Enerco lacks standing to bring this suit.

*B.  Causation and Directness*

█ Of the five factors relevant to a determination of antitrust standing, factors 1) the causal connection between the antitrust violation and the harm to the plaintiff, 3) the directness of the injury, and 4) the existence of more direct victims of the alleged antitrust violations all involve a similar analysis. Some courts have even considered these factors simultaneously. *See, e.g., Lower Lake,* 998 F.2d at 1167–1168. The causation analysis for determining antitrust standing is similar to the proximate cause analysis in the field of torts. *See generally AGC,* 459 U.S. at 533–536, 103 S.Ct. 897. Remoteness of the alleged injury is an aspect of the proximate cause analysis, in that an injury too remote from its causal agent fails to satisfy

that requirement. *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.,* 171 F.3d 912, 921 (3d Cir.1999). I will discuss causation and directness simultaneously.

The chain of causation from PPL's alleged violations to Enerco's injury involves at least three steps: 1) the link between PPL's actions and the higher ICAP prices paid by LSEs; 2) the impact these higher ICAP prices had on prices that LSEs charged end-users; and 3) the impact that higher retail prices had on end-users' decisions not to renew their contracts with Enerco. This chain reveals that there are at least two classes of victims who were more directly injured by PPL's actions than Enerco: 1) the LSEs who had to pay higher ICAP prices and 2) the end-users who had to pay higher electricity prices. The Supreme Court held that even those at step two of this causal chain, the end-users of electricity, do not have antitrust standing because their injury is too remote. *See Kansas v. UtiliCorp United, Inc.,* 497 U.S. 199, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990) (utility customers, as indirect purchasers, were barred from challenging excess prices charged to their utilities by wholesalers); *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) (the state, who had purchased bricks from subcontractors who in turn had purchased them from defendant, was an indirect purchaser who had no standing to sue the defendant).

Any injuries that Enerco sustained from PPL's alleged antitrust violations is derivative of injuries that the end-users of electricity, Enerco's customers, sustained. Given that even end-users, more direct victims of PPL's alleged violations, do not have antitrust standing because their injury is too remote, I must conclude that Enerco's injury is also too remote to satisfy the causation and directness requirements of antitrust standing.

## V. CONCLUSION

For the reasons set forth above, defendants' motion to dismiss is granted.